Ronald P. KELLY, Plaintiff,

v.

**SECRETARY OF HEALTH AND
HUMAN SERVICES,**
Defendant.

No. 93–CV–485C.

United States District Court,
W.D. New York.

Dec. 8, 1994.

Jeffrey Freedman Attorneys at Law (Kenneth R. Hiller, of counsel), Buffalo, NY, for plaintiff.

Patrick H. NeMoyer, U.S. Atty. (Joseph J. Karaszewski, Asst. U.S. Atty., of counsel), Buffalo, NY, for defendant.

CURTIN, District Judge.

Plaintiff Ronald Kelly filed this action to challenge a decision of the Defendant Secretary of Health and Human Services that he is not entitled to disability insurance benefits under the Social Security Act ("the Act"), 42 U.S.C. § 301 *et seq.*

Mr. Kelly applied for disability insurance benefits on October 8, 1991. A.R. 100–02.[1] The application was denied initially on May 5, 1992, A.R. 104–06, and on reconsideration on July 3, 1992. A.R. 127–29. Mr. Kelly then requested a hearing, which was held on October 19, 1992. A.R. 38–99. On November 17, 1992, Administrative Law Judge ("ALJ") Karen H. Baker issued a decision finding that Mr. Kelly was not under a disability, and affirming the denial of his application for benefits. A.R. 7–25. Her decision became the final decision of the Secretary on April 8, 1993, when the Appeals Council denied Mr. Kelly's request for review. A.R. 4–5.

Both parties have moved for judgment on the pleadings. Items 5, 6, 9. They agree that the only issue to be determined is

---

**1.** Citations to the administrative record will be abbreviated as "A.R." followed by the appropri-
ate page number.

whether the Secretary's decision is supported by substantial evidence.

## FACTS

### A. The Plaintiff

Ronald Kelly is a 52–year–old former truck driver who lives in Lakeview, New York. He claims to have been disabled by a lower back problem since July 27, 1989, when he was involved in an automobile accident. A.R. 45, 133, 171–72.

Mr. Kelly was born on July 25, 1942. A.R. 100. He almost completed tenth grade, and obtained a General Equivalency Diploma ("GED") in 1960. A.R. 42–43, 137. He has some difficulty reading and writing, but can read a newspaper. A.R. 83.

Before his accident, Mr. Kelly had worked for about 20 years as a truck driver. A.R. 43–44, 137. His earnings record indicates that he engaged in relatively little paid work in the years from 1982 through 1989. A.R. 10, 132. For much of the time during those years, he stayed at home to care for his handicapped daughter, while his wife went out to work. A.R. 10, 55–58. In 1988, however, he returned to work because he started to get into financial trouble. A.R. 10, 57–58.

In January, 1992, Mr. Kelly received $125,-000.00 plus medical expenses in settlement of an insurance claim resulting from his accident. A.R. 84–85.

### B. Medical Evidence

Mr. Kelly apparently suffered no significant problems immediately after his automobile accident on July 27, 1989. A.R. 47, 171. Six or seven hours later he began to feel lower back pain, which became severe by the following day. A.R. 171, 176–77. He claims that he consulted his family physician, Lawrence Plumb, M.D., and that he was given pain medication. A.R. 70–71, 171. There is no documentation of this in the record. A.R. 11. However, it appears that on July 28, 1989, the day after his accident, he visited Southtowns Radiology, where x-rays were taken. A.R. 176–77, 188. The Southtowns

Radiology report evidently indicated that his lumbar spine was normal. A.R. 188. Ten months later, however, the x-rays were reviewed by treating physician James J. White, M.D., an orthopedic surgeon, who found that they were "compatible with the MRI examination [done on April 9, 1990—see A.R. 190, 192] that showed disc degeneration and herniation centrally at L4–5." Id. Dr. White also referred to a CT scan done at Erie County Medical Center ("ECMC") on September 15, 1989, which showed "a central protrusion of the disc at L5–S1 and a more diffuse annular bulge at L4–5, which probably represents a central disc herniation." A.R. 191.

Between November 20, 1989, and April 23, 1990, Mr. Kelly consulted and received treatment for his back problems from Anthony Amabile, D.C., a chiropractor. A.R. 162–70. On the first visit, Dr. Amabile noted that Mr. Kelly suffered from "moderate chronic subluxations at L4, L5", that he walked with a limp, and that he experienced pain with limited range of motion in the lumbosacral region. A.R. 164. On December 20, 1989, Dr. Amabile noted that Mr. Kelly's condition had improved, that his range of motion had increased, with no indication of pain during examination, and that "he feels much better but occasionally gets pain down leg. Sublux. L4, L5 improved." A.R. 163. There is no record of any assessment by Dr. Amabile of Mr. Kelly's capacity to work.[2]

On December 22, 1989, Mr. Kelly was examined by Dr. Patrick Hughes, a neurologist. A.R. 171–72. Dr. Hughes found no neurological defects. He reviewed the CT scan that had been performed at ECMC, and agreed with the ECMC interpretation that it showed "a bulging disc at L4–5." A.R. 172. He formed the impression (1) that Mr. Kelly's back pain was related to his disc bulging at L4–L5, (2) that this was related to his accident, (3) that Mr. Kelly should be able to return to work in about two months, (4) that if the disc herniated in the future, Mr. Kelly might require surgery, and (5) that at that

---

**2.** 20 C.F.R. § 404.1513 excludes chiropractors as "acceptable medical sources," but includes them as "other sources" which may be helpful to the ALJ in determining how an impairment may affect a claimant's ability to work. 20 C.F.R. §§ 404.1513(a), (e).

time, Mr. Kelly was "disabled for truck driving." *Id.*

Mr. Kelly was examined by orthopedic surgeon James J. White, M.D., on April 6, 1990. A.R. 190A–91. Dr. White's examination revealed tenderness in the lower lumbar spine at the L4–5 and S–1 disc levels, greater weakness in the right lower extremity than in the left with repetitive tiptoeing, and pain radiating to the left posterior thigh upon forward flexion. Neurological evaluation revealed weakness of the right extensor hallucis longus muscle with decreased sensation to pinprick in the right L–5 and S–1 root distributions. As noted above, Dr. White also examined the CT scan taken at ECMC on September 15, 1989. He expressed the opinion that Mr. Kelly had degeneration in the discs at L4–L5 and S–1, and a central herniation at L4–5. He considered Mr. Kelly to be disabled at that point in time from returning to his occupation as a truck driver, and recommended a Magnetic Resonance Imaging ("MRI") examination.

An MRI was performed on April 9, 1990. A.R. 190, 192. It confirmed a central disc herniation at L4–5. *Id.* Dr. White wrote to Mr. Kelly's insurance company that:

> [m]y basic feeling, of course, is that there is no reason to do surgery unless the patient feels the pain is unacceptable and he cannot live with it. He tells me that he has not been able to work because of his major complaint of low back pain. He has secondary complaints of pain radiating into the left lower extremity. The central disc herniation is classic for the complaints of low back pain in the face of a normal neurological evaluation.
>
> My recommendation to the patient, therefore, is that he have an L4–5 discectomy and fusion at that level. I would hope that after a period of time, between 4–6 months, that he could return to his previous occupation.

*Id.*

On June 4, 1990, Dr. White re-examined Mr. Kelly, and reviewed the x-rays that had been taken at Southtowns Radiology on July 28, 1989. A.R. 188–89. He found the x-rays to be compatible with the MRI results show-

ing disc degeneration and herniation at L4–5. He believed that:

> a decompression of both L–5 roots and probably a discectomy, and certainly a fusion of 4–5 would resolve the majority of this gentleman's complaints.
>
> . . . .
>
> The most important thing that I tried to discuss with Mr. Kelly is that this surgery can be done any time he feels his disability is great enough to warrant surgical intervention. There certainly is no hurry for us to do anything. If he cannot return to his previous occupation as a long haul truck driver, then that may or may not effect [sic] his decision for surgery.

*Id.*

On August 9, 1990, Dr. White performed a left L4–5 discectomy and fusion at Buffalo General Hospital. A.R. 148–51. Mr. Kelly was discharged on August 12, 1990. A.R. 148. He was re-examined by Dr. White on September 10, 1990. A.R. 187. He complained of increasing low back pain at that time, but Dr. White found this not surprising, and indicated that it should resolve. Dr. White advised Mr. Kelly to ambulate, but to avoid activities involving bending, lifting, and twisting. *Id.*

Mr. Kelly was examined by the neurologist, Dr. Hughes, on November 2, 1990. A.R. 173–74. Dr. Hughes noted that Mr. Kelly complained of constant low back pain, and pain going down the left leg to the calf. Mr. Kelly told Dr. Hughes that he could not sit for any more than 25 or 30 minutes because of increasing pain, and that this was relieved by getting up and walking around. Mr. Kelly was taking Codeine #3 about twice a day. Dr. Hughes' examination revealed that Mr. Kelly could not bend forwards, backwards, or to the sides because he was in too much pain. Dr. Hughes was puzzled by the fact that Mr. Kelly was still having severe pain almost three months after surgery.

Dr. White examined Mr. Kelly a week later, on November 9, 1990. A.R. 186. Mr. Kelly was still complaining of low back discomfort. Dr. White stated that he was "more than pleased with [Mr. Kelly's] status

at [that] time," but that he "remain[ed] disabled."

At a further meeting with Dr. White on February 11, 1991, Mr. Kelly again complained of low back pain. A.R. 185. X-rays indicated that "[t]he fusion mass to the left of the midline at L4–5 look[ed] excellent," but to the right there were lines suggesting delayed healing. Dr. White indicated that he would "continue [Mr. Kelly] on his disability."

Two weeks later, on February 27, 1991, Mr. Kelly was examined by Joseph C. Tutton, M.D., a neurologist. A.R. 176–79. Dr. Tutton noted that Mr. Kelly had complained of low back pain and pain in his left leg, which had been about the same, or had possibly worsened, since his surgery. A.R. 177. He found that Mr. Kelly did not have particular tenderness over the lower back, but that he had marked limitation of motion of the back in all directions, and complained of pain with all such motions. A.R. 178. Mr. Kelly also complained of pain on straight leg raising, though without much limitation of motion. Id. Dr. Tutton concluded that Mr. Kelly had had significant low back difficulty due to a ruptured disc, that in the long-run there would be considerable improvement, but that once it was established that the fusion at L4–5 was solid, Mr. Kelly would need considerable long-term physical therapy to achieve rehabilitation. Id. He expressed the opinion that Mr. Kelly was "totally disabled for work at this time," and that it was questionable that he would ever be able to return to work as an "over-the-road truck driver." Id.

Dr. White examined Mr. Kelly again on May 13, 1991. A.R. 184. At that time, Mr. Kelly complained that his pain was getting worse. Dr. White reviewed new x-rays of the lumbar spine and concluded that the bone mass was "much better," but there was no solid fusion. He concluded that if there was no fusion in three months, serious consideration should be given to further surgery. Mr. Kelly "remain[ed] disabled."

Mr. Kelly was next examined by Dr. White on August 12, 1991. A.R. 182–83. Dr. White noted Mr. Kelly's continued complaints of low back pain, and that Mr. Kelly was unable to get about without a corset. He took further x-rays, which provided evidence of motion at L4–5, indicating a pseudarthrosis at that level. Dr. White prescribed pain medication, and recommended "a resection of the pseudarthrosis at L4–5 with posterior Zielke instrumentation and repeat bone grafting." A.R. 182.

Dr. White's final examination of Mr. Kelly was on January 30, 1992. A.R. 197. At that time, Mr. Kelly was still complaining of low back pain. He had been scheduled for surgery on November 19, 1991, and again on January 22, 1992, but those surgeries had to be cancelled because of illness. Id.; see also, A.R. 71–72.

At the Secretary's request, Mr. Kelly was examined by Dennis B. Phillips, D.O., on April 3, 1992. A.R. 198–203. Dr. Phillips described Mr. Kelly's symptoms as follows:

Now his symptomatology includes low back pain that is constant. It is a dull, aching type of pain that becomes sharp at times. He has radiation to the left leg that comes and goes approximately 3–4 times a day.... He has constant stiffness in the low back that lasts 24 hours a day. The lower extremity has no strength problems now after the initial surgery.... He has no range of motion problems of the lower extremities and no swelling.... If he sits for greater than 20 minutes, stands for one hour, lays in the supine position for greater than one minute, walks greater than two blocks or climbs more than half a flight of stairs his symptomatology all worsens and occurs [sic]. He uses a device of a back brace any time he is standing. He uses a cane in the right hand when there is inclement weather outside. He is on restrictions of no bending and no lifting.

A.R. 198–99. Upon examination, Dr. Phillips found that Mr. Kelly:

is unable to stand or sit for a length of time, and then he has to get up and move around. He does move very slowly. Position changes from sit to stand and stand to sit are done carefully and seem to cause pain. When he goes from sit to supine position and the opposite, he appears in a great deal of discomfort.... There was

exquisite tenderness on the PSIS[3] on the left. There is also tenderness at the L4–L5 and sacral interspaces today.... CNS examination shows patient's gait to be slow and careful. He uses no devices today. Heel and toe walk are able to be done but done carefully.... Patient was able to squat and rise out of the squat okay.

A.R. 199–200. Dr. Phillips assessed Mr. Kelly as having lumbosacral-iliac somatic dysfunction, with decreased range of motion and motor function, and symptomatology "as noted above." A.R. 200–01.

### C. Mr. Kelly's Testimony

At his administrative hearing on October 19, 1992, Mr. Kelly testified that he was unable to "do anything really." A.R. 46. He said he could squat down and pick things up, as long as they were not heavy. A.R. 46, 51. He could lift a fifteen-pound weight, but only from desk level, and even then he might feel pain down his left leg. A.R. 46. He could experience problems if he walked as little as two city blocks. A.R. 47. He could not sit for very long at one time. A.R. 48. He would sometimes experience pain if he drove for 30 miles or more. A.R. 49–50. He frequently wore a brace to support his back and temporarily relieve pain. A.R. 53–55, 82–83. He could undertake a few light household chores, and do a little gardening. A.R. 52–53, 61–62, 136. He had difficulty climbing stairs. A.R. 67–68.

Mr. Kelly testified further that he drank 12–14 beers a day, to pass the time and help him sleep. A.R. 73–74, 81A. He did not, however, consider that drinking disabled him, and had never sought treatment for his drinking. A.R. 81A, 85. He took aspirin, and tylenol # 3 with codeine, as pain medication. A.R. 68–69.

### D. Vocational Evidence

Norman Fertig, a vocational expert, also testified at Mr. Kelly's hearing. He was asked by the ALJ to identify jobs that would be suitable for a "younger" individual with a GED degree and work experience only in trucking, who (1) could generally stand and walk for short distances, but needed to have the option of sitting for short periods of time, (2) should not lift anything exceeding 20 pounds, and that only occasionally, (3) should not lift items from below waist level, (4) could not bend frequently, (5) could only attempt limited postural changes. A.R. 87–89. Mr. Fertig identified the jobs of security guard and dispatcher, and testified that there were 5,000 of the former and 1,800 of the latter positions in the Western New York area. A.R. 89, 91. He also identified the job of security system monitor, but did not know how many of these positions there were in the local economy. A.R. 92.

### DISCUSSION

### 1. Standard for Entitlement to Benefits

■ A claimant is considered disabled under the Act if he can demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *White v. Secretary of Health and Human Services,* 910 F.2d 64, 65 (2d Cir.1990). His impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A); *White,* 910 F.2d at 65. The claimant has the initial burden of proving that his impairment prevents him from returning to his past work, but thereafter the burden shifts to the Secretary to prove that he can engage in alternative employment. *White,* 910 F.2d at 65 (citing *Bluvband v. Heckler,* 730 F.2d 886, 891 (2d Cir.1984); *Ferraris v. Heckler,* 728 F.2d 582, 586–88 (2d Cir.1984)).

■ To be eligible for disability benefits, a claimant "must have been insured within the meaning of 42 U.S.C. § 423(c) at the onset date of his or her disability...." *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *see also, Arnone v. Bowen,* 882 F.2d 34, 37–38

---

3. Psoas-iliosacral area. A.R. 19.

(2d Cir.1989). Evidence of an impairment that reached disabling severity after the expiration of the claimant's insured status cannot be the basis for entitlement to disability insurance benefits, even though the impairment may have existed before the insured status expired. *Arnone v. Bowen,* 882 F.2d at 37–38; *see also, Manzo v. Sullivan,* 784 F.Supp. 1152, 1156 (D.N.J.1991).

In evaluating disability claims, the Secretary employs a five-step sequence described in 20 C.F.R. § 404.1520. The Second Circuit has described the procedure as follows:

> "First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform."

*Bluvband v. Heckler,* 730 F.2d at 891 (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)). The claimant bears the burden of proof as to the first four steps, but the Secretary must prove the final one. *Id.*

█ The final step in the Secretary's evaluation entails consideration of the claimant's age, education, and past work experience, and of his "residual functional capacity" to work. 20 C.F.R. § 404.1520(f). The term "residual functional capacity" means "what [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a). It is a medical assessment, although it properly includes a description (even a claimant's own) of limitations that go beyond the symptoms that may be important in the diagnosis and treatment of the claimant's medical condition. *Id.* It is a measure of a claimant's capacity to work, and may include an assessment of physical abilities, mental impairments, and other impairments. 20 C.F.R. §§ 404.1545(b), (c), and (d).

The Secretary will give controlling weight to a treating physician's opinion of the nature and severity of a claimant's impairment, if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record...." 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993).

## 2. *Scope of Judicial Review*

█ This court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Secretary's factual determinations are conclusive if they are supported by substantial evidence on the record as a whole. *Id.; Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion.' " *Alston v. Sullivan,* 904 F.2d at 126 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). To determine whether the Secretary's findings are supported by substantial evidence, the court must consider "the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on Behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)); *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983). Where evidence has not been properly evalu-

ated because of an erroneous view of the law, the determination of the Secretary should not be upheld. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

 It is the function of the Secretary, and not of the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 642 (2d Cir. 1983). The Secretary "need not resolve every inconsistency and ambiguity in the record...." *Bluvband v. Heckler,* 730 F.2d at 892. Nevertheless, the court should keep in mind that the Secretary has an obligation to "affirmatively assist the parties in developing the record ... with the recognition that '[t]he Social Security Act is a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.'" *Id.* (quoting *Marcus v. Califano,* 615 F.2d at 29).[4] Thus, where there appear to be ambiguities in the record concerning facts that are crucial to the determination of a claimant's disability, the court must be satisfied that the Secretary has not resolved those ambiguities arbitrarily against the claimant.

### 3. The ALJ's Decision

The ALJ found, on the basis of earnings through 1989, that Mr. Kelly met the disability insured status requirements of the Act at the time of his accident, and continued to meet them through September 1990 but not thereafter. A.R. 10, 23. She found that he had not engaged in substantial gainful activity since the date of his accident, and that he suffered from an impairment which had imposed significant functional limitations for more than 12 continuous months, satisfying the duration requirement of 20 C.F.R. § 404.1509 and completing the first two steps of the evaluation of disability required under 20 C.F.R. § 404.1520. A.R. 10. She found

that he had been incapable of returning to his past work as a truck driver since the date of his accident, but that his impairment "cannot be said to have approached in severity the condition listed in section 1.05C, Appendix 1, at any time from the date of onset." A.R. 14. This completed the third and fourth steps under 20 C.F.R. § 404.1520.

The ALJ then considered Mr. Kelly's residual functional capacity to perform work other than his past work, the final step in disability evaluation under 20 C.F.R. § 404.1520. A.R. 14–22. She found that Mr. Kelly had been "capable of essentially the full range of light work[5] from July 27, 1989, through at least July 1, 1990." A.R. 14. She acknowledged that for some after his surgery, Mr. Kelly would not have been able to perform even sedentary work on a sustained basis, but she found that "this level of debilitation would [have been] restricted to the post operative recovery period." A.R. 16–17. She then went on to determine that "with the exception of a period of less than 10 months immediately after surgery, the claimant has retained the residual functional capacity for essentially the full range of light work at all times from July 27, 1989." A.R. 21. She made it clear that she did not find Mr. Kelly's complaints of pain and functional incapacity credible, "given the record as a whole, and his reported daily activities and the pattern of treatment for pain." A.R. 23; *see also,* A.R. 20–21.

Noting that Mr. Kelly was a "younger" individual[6] with a high school equivalency diploma, that his heavy alcohol consumption had not resulted in any physical or mental impairment, and that there was "no evidence of any nonexertional functional limitations further proscribing the occupational base of light work of which the claimant is exertionally capable," the ALJ found Mr. Kelly to be "not disabled" pursuant to 20 C.F.R.

---

4. This obligation is heightened when the claimant is *pro se,* but exists even when he is represented by counsel. *See Fishburn v. Sullivan,* 802 F.Supp. 1018, 1025–26 (S.D.N.Y.1992).

5. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of

walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

6. Under age 50. *See* 20 C.F.R. § 404.1563(b).

§ 404.1569 and Rules 202.17–202.22, Table No. 2, Appendix 2 to Subpart P (Medical–Vocational Guidelines). A.R. 22, 24.

The ALJ found that Mr. Fertig's testimony confirmed that 6,800 jobs that could be performed by a person with Mr. Kelly's limitations existed in the regional economy. A.R. 22, 24. The testimony confirmed the conclusion reached by the ALJ under the Vocational Rules. A.R. 22.

The ALJ concluded that Mr. Kelly was not under a disability as defined under the Act at any time through September 30, 1990, when his insured status expired, and that he was not, therefore, entitled to disability insurance benefits. A.R. 22, 24–25.

### 4. The Parties' Motions for Judgment on the Pleadings

In support of his motion for judgment on the pleadings, Mr. Kelly argues first that his subjective complaints of pain and functional limitations, if found credible, mandate a finding of disability. Item 9, pp. 10–13. He then argues that the ALJ erred by failing to accord great weight to those subjective complaints. *Id.* at 13–18. The Secretary maintains that the ALJ's decision was supported by substantial evidence, and should be affirmed. Item 6, pp. 19–27.

I begin by observing that the ALJ found, and neither party disputes, that Mr. Kelly met the disability insured status requirements of the Act through September 1990, but not thereafter. For Mr. Kelly to have any claim to eligibility for benefits under the Act, therefore, his impairment must have reached disabling severity by September 30, 1990. *See Rivera v. Sullivan,* 923 F.2d at 967; *Arnone v. Bowen,* 882 F.2d at 37–38. Further, he must have been unable to engage in any substantial gainful work for a continuous period of twelve months from the time at which his impairment reached disabling severity. 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(2)(A); 20 C.F.R. § 404.1505 and 404.1509; *White,* 910 F.2d at 65. I also note that the ALJ found, and again neither party disputes, that Mr. Kelly has been unable to work as a truck driver since the time of his accident on July 27, 1989. Therefore, Mr. Kelly has met his burden of showing that his

impairment has prevented him from returning to his previous employment. In reviewing the ALJ's decision, therefore, I must determine whether there is sufficient evidence in the record to support a finding that the Secretary has met her burden of proving that Mr. Kelly retained, in the relevant time period or periods, the residual functional capacity to perform alternative work existing in the national economy. *White,* 910 F.2d at 65; *Bluvband v. Heckler,* 730 F.2d at 891.

■ A fair reading of the record confirms that there is sufficient evidence to support the ALJ's finding that Mr. Kelly was "capable of essentially the full range of light work from July 27, 1989, through at least July 1, 1990." A.R. 14. In reaching her conclusion, the ALJ reviewed the reports of Dr. Amabile and Dr. White for that period in considerable detail. A.R. 11–14. As the ALJ noted, those reports conveyed no sense of urgency regarding Mr. Kelly's symptoms, A.R. 14, and although they establish that he was unable to return to his work as a truck driver, the symptoms they describe are compatible with a conclusion that he was capable of performing light work as described in 20 C.F.R. § 404.1567(b). The ALJ's determination is supported by her observation that Dr. White prescribed no medication of any sort for Mr. Kelly prior to his surgery in August 1990, A.R. 12, and by her review of Mr. Kelly's own testimony concerning his physical limitations during the period from July 1989 to August 1990. A.R. 14–15.

The ALJ acknowledged that for some time after his surgery, Mr. Kelly could not have performed even sedentary work on a sustained basis. A.R. 16–17. Since the surgery was carried out on August 9, 1990, Mr. Kelly's impairment unquestionably reached disabling severity before his insured status expired on September 30, 1990. The crucial question becomes, therefore, whether his inability to engage in any substantial gainful activity continued until at least August 9, 1991, satisfying the requirement that the period of disability last or be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *White,* 910 F.2d at 65.

The ALJ found that Mr. Kelly's inability to perform even sedentary work "would [have been] restricted to the post operative recovery period." A.R. 17. She held that this period of recuperation ended some time before Dr. Tutton examined Mr. Kelly on February 27, 1991, A.R. 18, and that after that time, Mr. Kelly would have been able to perform light work again. A.R. 21. Thus, under the ALJ's reading of the record, Mr. Kelly could not have satisfied the twelve-month period of disability requirement of 42 U.S.C. § 423(d)(1)(A). I find, however, that the ALJ's conclusion that Mr. Kelly had recovered sufficiently from his operation to be able to work by the end of February, 1991, is not supported by substantial evidence.

Mr. Kelly was examined by his treating physician, Dr. White, on a regular basis from the time of his surgery until January 30, 1992. In November, 1990, Dr. White noted that Mr. Kelly "remain[ed] disabled" following his surgery. A.R. 186. In February, 1991, he indicated that he would "continue [Mr. Kelly] on his disability." A.R. 185. On February 27, 1991, the neurologist Dr. Tutton examined Mr. Kelly and found him to be "totally disabled for work at this time." A.R. 178. And on May 13, 1991, Dr. White examined him again and found that he "remain[ed] disabled." A.R. 184. The simplest interpretation of these opinions is that through May 13, 1991, at least, Mr. Kelly had not recovered sufficiently from his surgery to be able to perform any work.

The ALJ observed that Dr. White "provided no exact parameters to define the degree of 'disability' attributable to [Mr. Kelly's] back condition, except to state [in a report to Mr. Kelly's insurance company on April 9, 1990, *before* the surgery on August 9, 1990] that his patient could not return to his past work as a truck driver prior to surgery." A.R. 16. She concluded that "[g]iven the claimant's persisting complaints of back pain after surgery, the [ALJ] would expect that the same recommendation against returning to truck driving would continue to apply." *Id.* I find this conclusion to be without basis, and entirely speculative. In his April 9, 1990, report, Dr. White expressed a carefully qualified opinion that at that time, Mr. Kelly

"should be considered disabled … from *returning to his occupation as a truck driver.*" A.R. 191. His reports in November 1990, February 1991, and May 1991 contained no such qualification. Given the intervening surgery, and the fact that Mr. Kelly would have been incapable of performing even sedentary work for some time thereafter, as the ALJ acknowledged, the ALJ's interpretation of Dr. White's use of the word "disabled" in his November 1990, February 1991, and April 1991 reports is unfounded. The clear implication of Dr. White's reports is that he regarded Mr. Kelly as being completely disabled through May 13, 1991.

This view is supported by Dr. Tutton's opinion that Mr. Kelly was "totally disabled for work" on February 27, 1991. A.R. 178. The ALJ discounted this opinion, asserting that it was "unclear whether Dr. Tutton [was] stating that the claimant [was] *'totally disabled' for his usual work,* especially since he refer[red] in the same sentence to disability within the context of the claimant returning to that regular occupation." A.R. 18 (emphasis in the original). I find that the ALJ's reading of ambiguity into Dr. Tutton's opinion was entirely unnecessary, and represents a distortion of the record. Dr. Tutton wrote that Mr. Kelly "is totally disabled for work at this time and it is questionable in my mind, with the low back disease that he has and with the fusion, whether he will ever be able to return to work as an over-the-road truck driver." A.R. 178. This statement makes a very clear distinction between Mr. Kelly's *total disability for work at that time* and his *future capacity to return to his previous work* as a truck driver. The ALJ had no reason to find any lack of clarity in the statement.

■ The ALJ was required to give controlling weight to Dr. White's opinion of the severity of Mr. Kelly's impairment, if that opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan,* 3 F.3d at 56. There is nothing to suggest that Dr. White's opinion that Mr. Kelly remained disabled through at least

May 13, 1991, was not supported by the use of medically acceptable diagnostic techniques, or that it was inconsistent with other substantial evidence on the record. I find that the ALJ erred in failing to give it controlling weight.

The ALJ did review the clinical symptoms described by Drs. White, Tutton, and Hughes in the period between Mr. Kelly's surgery and May, 1991. A.R. 15, 17–18. Based on this review, she stated that "[c]onsidering the clinical signs and laboratory findings reported by Dr. Tutton, the [ALJ] concludes that the acute period of post-operative recuperation had been completed prior to the time of Dr. Tutton's examination on February 27, 1991." A.R. 18. I have no reason to disagree with that evaluation. On the other hand, I cannot concur with the ALJ's view that "[t]he evidence is consistent with a conclusion that, *since* recovery from surgery in *approximately February 1991*, the claimant has been again able to stand and walk intermittently for up to two thirds of the workday, sit intermittently for at least one-third of the workday, and lift and carry up to ten pounds frequently or up to 20 pounds on occasion (without bending over to lift things, but lifting them from waist height)." A.R. 21 (emphasis added). Neither Dr. White nor Dr. Tutton gave precise evaluations of Mr. Kelly's capacity to stand, walk, lift, or carry in their February, 1991, reports. They both expressed the opinion that Mr. Kelly remained disabled at that time.

In making her determination that Mr. Kelly regained the residual functional capacity to perform light work by February, 1991, the ALJ appears to have given consideration to Mr. Kelly's hearing testimony concerning his daily activities and physical limitations. A.R. 20–21. However, that testimony concerned, almost exclusively, Mr. Kelly's physical limitations *at the time of the hearing in October, 1992.*[7] No questions were directed towards determining the extent of his capabilities in February 1991, or towards establishing whether, and to what extent, he may have regained the capacity to work by that time.

There is simply nothing in Mr. Kelly's testimony to support the ALJ's conclusion that he recovered the ability to engage in gainful activity by February 1991.

In summary, I find that the ALJ's determination that Mr. Kelly regained the capacity to work by February, 1991, is not supported by substantial evidence. The ALJ unnecessarily read ambiguity into the February, 1991, opinions of Drs. White and Tutton that Mr. Kelly remained disabled at that time. She then resolved that supposed ambiguity to Mr. Kelly's disadvantage, without the benefit of substantial evidence and in an apparently arbitrary fashion, failing to "affirmatively assist the parties in developing the record" with respect to Mr. Kelly's capacity to work in February, 1991. *Bluvband v. Heckler,* 730 F.2d at 892. In so doing, she improperly declined to give controlling weight to the opinion of Dr. White that he remained disabled at that time. 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan,* 3 F.3d at 56.

There is nothing in the record to support a finding that Mr. Kelly regained the residual functional capacity to work at any time before April 3, 1992, when, at the request of the Secretary, he was examined by Dr. Phillips for the purpose of evaluating his disability claim. As noted above, Dr. White concluded on May 13, 1991, that Mr. Kelly remained disabled at that time. On August 12, 1991, he noted that Mr. Kelly continued to have complaints of low back pain, and that because of his inability to deal with those complaints he was requesting surgical intervention. A.R. 182. In his August, 1991, reports, Dr. White made no further comment on Mr. Kelly's physical capabilities at that time, except to say that he was "unable to get about without [a] corset." A.R. 182–83. He prescribed pain medication, and recommended surgery. *Id.* Surgery was scheduled on at least two occasions, but was cancelled because of Mr. Kelly's illness. A.R. 197. On January 30, 1992, Dr. White again examined Mr. Kelly, but noted only that he had "persisting complaints of low back pain." *Id.*

7. A few questions were directed towards establishing the extent of Mr. Kelly's physical limitations in the period before his surgery in August 1990, and, in a very general sense, the extent of his incapacity in the year following surgery.

Dr. White's reports are all consistent with continued disability through January 1992. In contrast, there is simply no evidence in the record to support a finding that Mr. Kelly regained the residual functional capacity to work during this period.

I conclude that Mr. Kelly's impairment reached disabling severity by August 9, 1990, before the expiration of his insured status on September 30, 1990. Mr. Kelly remained disabled under the meaning of the Act for a continuous period of more than twelve months from August 9, 1990, entitling him to disability benefits. There is nothing in the record to establish that his disability ended before April 2, 1992.

It may be that there is sufficient evidence in Dr. Phillips' report of his examination of Mr. Kelly on April 3, 1992, and in the October 19, 1992, hearing testimony of Mr. Kelly and of the vocational expert, Mr. Fertig, to enable the Secretary to meet her burden of demonstrating that Mr. Kelly was capable of working in the period after April 3, 1992. I do not reach that question, however. Since I have determined that Mr. Kelly was entitled to receive benefits in the period between August 1990 and April 1992, the Secretary must now be given the opportunity to decide whether, and if so when, his benefits should have been terminated, applying the standards set forth in the Act and the regulations. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594. *See Glenn v. Shalala,* 21 F.3d 983, 986 (10th Cir.1994); *Jones v. Shalala,* 10 F.3d 522, 524 (7th Cir.1993); *Fleming v. Sullivan,* 806 F.Supp. 13, 14–15 (E.D.N.Y. 1992).

### CONCLUSION

For the reasons given above, the Secretary's decision that Mr. Kelly was not under a disability in the period from July 27, 1989, through August 8, 1990, is affirmed. Her decision that Mr. Kelly was not under a disability following his surgery on August 9, 1990, is reversed. The case is remanded for computation of benefits for the period August 9, 1990, through April 2, 1992, and for further proceedings to determine whether benefits should have been discontinued at any time after April 2, 1992, applying the stan-

dards set forth in the Act and the regulations. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594.

So ordered.